We'll hear argument this morning in Case 11-204, Christopher v. SmithKline Beecham. Mr. Goldstein. Mr. Chief Justice, may it please the Court. In the Fair Labor Standards Act, Congress directed the Secretary of Labor to, quote-unquote, define and delimit the statute's outside salesman exemption. By regulation, the Secretary provided that an outside salesman is one who makes sales rather than promoting sales by others. In further guidance, the Secretary elaborated that non-exempt promotion includes either, one, a conversation where there can be no commitment, or two, one where there will be no exchange with the employer. Now, everyone agrees that a pharmaceutical detailer engages in promotion. They tout drugs to doctors. Everyone agrees that there can't be a commitment to issue a prescription. Everyone agrees that a prescription is not an exchange with a pharmaceutical company. But nonetheless, the Respondent argues that pharmaceutical detailers sell drugs directly to doctors as a matter of law. They say that follows from the fact that the Secretary's regulation incorporates the definition of sale in the FLSA, which is in the blue brief in the appendix at page 1. That definition, which is section 203K, provides, it's the second provision on the page, sale or sell includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition. And what you will not find in that language is anything that contradicts the two points the Secretary has made, which is that there has to be a commitment or that at the very least there has to be an exchange with the employer. Well, is that consistent with the government's argument? They argue, quote, An employee does not make a sale for purposes of the outside salesman exemption unless he actually transfers title to the property at issue. The statute refers to a consignment for sale. When that occurs, does the consignor actually transfer title to the property at issue? It is an arrangement for a transfer of title, and that's why it's critical that it says  But in all events, this case is not a fight about transferring title or some lesser form of exchange because there's no exchange between the doctor and the employer. Alito, I understand that, but I would appreciate an answer to my question. Yes. Is the government's position consistent with the reference to consignment for sale? When consignment for sale occurs, is there a transfer of title? There is an agreement for a transfer of title, and I believe that's true. Is there a transfer of title? I apologize. There is not a transfer of title, but there is an agreement for a transfer of title. They — just to be clear, the government says the definition of sale includes a transfer of title. And so all I'm pointing out, if I could just go back to the definition, I apologize for not asking. No, no, I understand. I understand your position to be different from theirs, but I — Oh, no. Perhaps I should ask them about their position. Well, I apologize if I've created— Excuse me. I don't agree that there's an agreement for transfer of title where there's a consignment, you give the property to somebody, and he says, I will sell it to somebody if somebody will buy it. Yes. There is no agreement to transfer title. There is— It's purely a future contingency. If someone will buy it, I will sell them — sell it to that person on your account. Yes. I believe — I will allow you — I apologize. I will allow you. The — it would be — you can do, I know, whatever you want. The government— No, I'm not real. But anyway, go ahead. Yes. All right. The statute refers to a consignment for sale. I believe they're defining a sale in that phrase. But in all events, the debate over whether it includes or is limited to a transfer of title is not at issue in this case, because what the — because all the statute requires is that there at the very least be some exchange of some part. There's going to be a binding agreement, a commitment, and that commitment will involve an exchange with the employer. What happens in pharmaceutical detailing is that there can't be any commitment to issue a prescription at all. Because the limitation on sale is they can't sell. By federal law, they can't sell. And you were debating about exchange, sale. What strikes one about this case is that these workers, they work autonomously. They don't clock in and out. They work outside the workplace. After they're trained, they have minimal supervision. Is there any other category of exempt workers that have that kind of autonomy and yet come under the wage and hours? I'm sorry. So your premise is that they are exempt to begin with? There are — I can tell you that there are a large number of employees who do work outside the workplace and are substantially more autonomous than are pharmaceutical detailers who have to operate from very strict scripts. There are — it's literally ridiculous. For example, what other — that's what I wanted to know. What other categories of people that seem to be autonomous, not the type that clocks in and out? Sure. Well, you can have emergency service workers that are working outside. There are lots of people. So, for example, you may be working at a — I don't understand what that is. I apologize. What's an emergency service worker? A police officer, a fireman, an ambulance driver, they are constantly outside the office. You can also have lots of different kinds of — Excuse me. They're not on duty all the time, aren't they? Don't they have hours of duty? My goodness. Some of them make enormous overtime wages because they've put in hours beyond their regular hours of duty. Well, that — These people have no hours of duty. That is not quite right, Justice Scalia. They are expected, the Joint Appendix explains, to be in the doctor's offices between 8.30 and 5 p.m. They work additional time. The fact that those — Well, isn't that just — I mean, that's when the doctors are there. That's — but that is when they are supposed to be in the doctor's offices. That's dictated by the — What about — what about the extras? I mean, we're told that part of this job is to have a good relationship with the doctors. It includes dinners. It may be conventions, entertainment, maybe golf. If you're right, would the time on the golf course get time and a half? Well, a couple of things about that, Justice Ginsburg. There actually are very strict restrictions. That kind of activity is under the Pharma Code, which is trying to interpret federal law. It's actually very heavily restricted. But whatever it is that the employee is doing to further the employment relationship is going to be hours on duty. It is really important, I think, that while it is true that a pharmaceutical detailer has many of the characteristics of an outside salesman, the one they don't have is selling. And that is the line that Congress do. You were giving examples, and we just stopped with emergency service worker, but you said there are many examples of people who are highly autonomous and still come under the hours regulation. Sure. Another example would be insurance adjusters. There are people who are outside cleaning people that are not, that don't have any And these are all within the Fair Labor Standards Act? Yes. Yes, Justice Kennedy. Are there any occupations or pursuits that are not covered by the Fair Labor Standards Act because on the rationale that they are out, that they are unsupervised? In other words, if you were arguing the case with the Respondent, would you have any close analogies to areas that are not, that are exempt? In other words, they wouldn't be salesmen, but there would be some other classification that's exempt? I would, but they would all be one of two things. They would either fall within the administrative exemption, which is, Justice Ginsburg, what Congress was talking about when it talked about people who have a lot of autonomy and which is not true of detailers, or some other exemption. So to give an example, certain outside buyers are exempt under the Fair Labor Standards Act. A good, that's a good example because if you're an outside buyer of poultry, then you are exempt. But if you are an outside buyer of meat, you aren't. It is one of a lot of different places. There are 50-some exemptions from the Fair Labor Standards Act. And Congress drew incredibly fine lines. Congress can draw even silly lines if Congress draws it. It's a line. But the line you're suggesting here, both your brief and the government's, as I recall, say, my goodness, if we find for the Respondent here, there will be so much uncertainty in the future. I'm not sure there isn't a lot of uncertainty if we find in your direction. Let me give you an example. One of my law clerks, I, my law clerks supplement my sparse life experience. One of my law clerks is familiar with the framing business. Okay. Now, salesmen of frames do not sell the frames at the time that they visit the framing company or the framing store. They get a commitment that in the future that person will order from the framing company. Now, is that a sale? That is a sale. But the difference here is that there's neither a commitment. Remember, the commitment is illegal as a matter of law. But there is a commitment. There is a commitment to which what they're trying to get is a commitment to consider this drug if it's appropriate for prescription to patients in the future. That's a commitment. Justice Scalia, if that is a commitment, then all of promotion, I think, is going to be a sale. Because every promoter who walks up to you on the street saying, will you try my product, will you go into the store, is trying to get you to say, I'll go in. And that is much more of a direct commitment than you saying, I'll consider it in an appropriate circumstance. The commitment by a doctor is precatory at most. They do not make any commitment in any instance that can be binding in any way that they will prescribe a drug for anyone. And remember, there is the second distinction. So that's one. But the second is that, remember, there is a purchase in your hypothetical of framing, a purchase from the framing store. But the second part of the Secretary's guidance is that when the doctor decides to issue a prescription, they're not exchanging anything with the drug company. Nothing is acquired from the drug company. That is a very significant difference. It's a peculiar line of commerce. And you're saying that what constitutes a sale, a salesman cannot take account of the fact that this is a weird line of commerce where you're selling to people who cannot make a commitment. Well, there are two things. The first is the commitment. And they are not selling anything to the doctor. Remember, just to frame this industry, the pharmaceutical company sells its products. It sells them to pharmaceutical wholesalers, which sell them to pharmacies, pardon me, which sell them to customers, which have a relationship with the doctor who may or may not have met with the detailer. There is a sale here in this industry, but it is to a pharmaceutical detailer. And that is a very significant difference. The critical point as well for purposes of the agency doesn't — May I ask you to follow up on other categories of employee. You gave me cleaning workers, emergency service workers. Are any of those categories people who get paid commissions? Those are not, but the example that I gave to Justice Kennedy would be, which is that there are outside buyers who do receive commissions. And remember, of course, that there are outside salesmen who do not receive commissions but are nonetheless exempt. Congress didn't write an exemption about commissions. It wrote them about whether it's an outside person who engages in sales. And the other point I was trying to make is that — and Justice Scalia echoed it to some extent — and that is that the FLSA draws very fine lines. If you work for a movie theater, you're exempt, but not a playhouse. If you work for a small newspaper but not a small magazine, you're exempt. If you care for the elderly but not the young, you're exempt. And what Congress said is that there has to be — you are an outside salesman. And it is true that this is a peculiar industry, but the peculiarity of it is that you don't make sales, if I could reserve the remainder of my time. Roberts. Thank you, counsel. Mr. Stewart. Mr. Chief Justice, and may it please the Court. It's common ground in this case that in order to be an outside salesman, an employee must make sales. And in theory, there are two different ways in which Respondent could have attempted to establish that the PSRs in this case fit that criteria. Would you answer Justice Alito's question? Your brief to the Second Circuit and the Ninth Circuit suggested that a sale is a transaction, a transfer of some sort, or at least a promise to purchase. But your brief here calls it a much more rigid test that there has to be a transfer of title. And he pointed to the language of 3X, 3K, that says consignment for sale, which doesn't have a transfer for title. So what is the government's position? Well, the DOL regulations have, since 19 — I believe it's since 1949, have said to make a sale within the meaning of 203K. The term making a sale within the meaning of 3K includes a transfer of title. And in theory, the verb includes could leave open the possibility that other things could be included as well. We've never encountered a situation in which DOL has found a sale of goods without a transfer of title. But in direct answer to your question, Justice Alito, I'll be honest. Excuse me, consignment salesmen are not exempt? It would be — with specific respect to consignments for sale, it would have been more precise to say that there has to be a transfer of possession in contemplation of a transfer of title. And what about salesmen whose objective is to obtain a rental? The lower courts have said that they qualify. Does the government disagree with that? DOL believes that they qualify, but not as sales of goods. And if the Court could look at the appendix to the blue brief on page 4, this is the pertinent regulation that refers to making sales or obtaining orders. And it says, Section 541.500 requires that the employee be engaged in making sales within the meaning of Section 3K of the Act or obtaining orders or contracts for services or for the use of facilities. And DOL's view is that a rental agreement would be a contract for services or for the use of facilities. And the way it's been — Scalia. How can they put in number 2? I thought that 3K is 3K. Can they supplement 3K? They have supplemented 3K, and they did that. What's the authority to do that? The authority — this is discussed in the Stein report, which was issued in 1940. And what had happened was that the question had arisen, and the Stein report lays this out in a fair amount of detail. The question had arisen whether individuals who negotiate for contracts to buy time on the radio or sell time — sell advertising space in newspapers or sell — negotiate contracts for carriage of freight by rail or truck, the question arose whether they were outside salesmen within the meaning of the statute. And the Stein report explained that the Wage and Hour Division had taken the position that they were not because it interpreted sales — it appears to have interpreted sales to refer only to sales of goods, and people who were engaged in those sorts of businesses were not selling goods. But the Stein report said, however, these people are commonly regarded as salesmen, that contracts they negotiate are treated as sales — Scalia. Well, that's wonderful. Then if you can go beyond 3K, I guess really the question before us is whether it's arbitrary or capricious for the agency not to extend their — their power to supplement 3K to — to this situation, which these people look like salesmen to me. And so if they can do number two there, I don't know why — why the agency couldn't say, oh, and by the way, detailers are also included. And the issue would be whether it's unreasonable for them not to say that. Stewart. The agency has taken the position that even though it has construed 3K to refer only to sales of goods, that sales of services or contracts for the use of facilities can be covered. However, there's a big difference between the interaction between a — a detailer and a physician and the interaction between the — the person who sells time on the radio. The person — There is. Sure, there is. But — but once you — once you concede that it doesn't have to be within 3K and that it's within the power of the agency to grant the exemption anyway, then we really have a different — a different argument before us here. Well, the — the theory on which the Stein report proceeded was that even though sales of time on the radio were not sales of goods, they were still customarily regarded as sales and they had the essential attributes of sales, namely an exchange of something valuable that the — the seller possessed in return for consideration from the buyer. And you don't have any of that when the detailer deals with the physician. Mr. Stewart, there's this other regulation, which is, I guess, in the coverage section, 779241, which says that if an employee performs any work that in a practical sense is an essential part of consummating the sale of the goods, he'll be considered to be selling the goods. So I guess this question is a two-part question. Do you agree that that regulation does cover the — these detailers? And the second part is, if you do, you know, how — how does it work that we should understand sale one way for purposes of coverage and another way for purposes of exemption? Well, the first thing I would say is we wouldn't agree that this would cover detailers. That is, if the relevant sales are, as we believe, GSK's sales to — the transfer of drugs to wholesalers and pharmacies in return for consideration, the detailers don't play an essential role in the consummation of those sales. They don't participate in those sales. It's true that their mission is to engage in activities which set in motion a chain of events that will make those sales more likely to occur. But we wouldn't regard them as — But that seems a little bit blind to the way the industry actually works. The way this industry actually works is the real work is done by the detailer getting the doctor to say, yes, I'm going to start prescribing this where it's medically appropriate. The actual sales from the company to the pharmacy just follows from however successful the detailer is. But I think much the same thing could have been said about all the promotional workers that DOL has done within the — has dealt with in the past. That is, the premise, the justification for a company to hire a promotional worker is that the promotional activities will increase the overall sales of the company, will either directly or indirectly set in motion a chain of events that leads people to buy the product, but DOL has historically regarded those activities as distinct from selling the product. Well, do those employees work on commissions? Some employees may work on commissions. Promotional workers do work on commissions. It's — I don't think there is necessarily a uniform rule one way or the other. The Stein report did say in 1940 that although it was characteristic for outside salesmen to receive commissions, that was not the test, that that was a quirk of compensation. The other thing I would say — Did we have detailers in 1940? Jeez, that's a long time ago. Did we have detailers in 1940? It's almost a century ago. There were detailers in that era. And — That's my point, actually. That's where I'm sort of bothered, just exactly what Justice Scalia said, that if you look through what I've seen so far by the materials, they're pretty evenly balanced. And there are tens of thousands of people who work in this industry, and there's a history of 75 years of nobody said anything. So you would think, and it isn't the only problem that has just been recognized in other industries, too. If the agency is going to reverse, not reverse, but suddenly do something it hasn't done for 75 years, the right way to do it is to have notice and comment, hearings, allow people to present their point of view, and then make some rules or determine what should happen. Perhaps they'd say, for the future, let's do this, but not let's give people a windfall for the past. Perhaps they'd say some and not others. Okay? That's my instinctive reaction, not necessarily legal, but informed by administrative law. But why shouldn't I try to get there? I guess I'd say two things, one general and one specific to detailers. The general thing is that DOL has consistently drawn a distinction between promotion of orders. I've read those. I've read those, and I find them beautifully ambiguous. I'll go back and read them again, and if they're absolutely clear, you win, fine. That's the end of it. And it's gone on for 70 years, and you're — and instead of doing a regulation, amended regulation, as Justice Breyer indicated, you're filing amicus briefs quietly in different courts. It seems to me that's not nearly as fair or straightforward or as candid as an agency ought to be. Well, with respect to where the industry expectation arose, we have only one data point, or at least only one data point that's been identified in the briefs. That is, the National Federation of Independent Small Business Legal Center has filed an amicus brief on Respondent's side. And then they did identify one DOL opinion letter, of which we were previously unaware, that dates from 1945. And in the opinion letter, the employer of the detailer asked for an opinion to the effect that its detailers were covered by the administrative exemption. The employer didn't request a ruling that these were outside salesmen. And DOL— You're right about that. And so they're at fault, too. But on the other hand, their employees might have been satisfied. And this is done to protect employees. So I'm asking, not saying, but what is the process here? How do you know the — at what level was this agency decision made to suddenly go ahead with this? Who made it? What was the input? How do you know they were on your side? You do know. You're right. But I mean, what's the process internally? Internally, the solicitor's office at the Department of Labor would consult with the Wage and Hour Division. The solicitor's name went on the briefs, both that were filed in the Ninth Circuit and the brief — I mean, the Ninth Circuit and also the Novartis brief in the Second Circuit. And the solicitor's name is on the government's brief in this court. The solicitor is the third-highest-ranking individual within the Department of Labor. Do you — I'm sorry to interrupt your answer, but does your office review the amicus filings in the courts of appeals by the agencies? There was S.G. authorization for the amicus to be filed. Is that the normal procedure? Yes. But this is part of a regular program that the agency has now instituted to run around the country and file amicus briefs. To clarify — well, to clarify the agency's view of what the proper understanding of the law is. And in terms of — Yeah, right. To get — instead of doing rulemaking, instead of doing adjudication, we're going to file amicus briefs, and the Court will accept our view as that amicus brief, and hey, presto, we have made law. That's extraordinary. Well, in comparison to the alternative step of filing enforcement actions, it's both — Well, did the Secretary of Labor herself or himself, depending on when it was, consider this matter? I don't know whether the Secretary — No, we don't. All right. So the alternative is not enforcement actions necessarily. The alternative is for the agency to focus on the question and decide what it actually wants to do. And the agency has regarded the application of its promotion sales regulations to the facts of this case as clear. That is, if you asked GSK's highest-level management why does it make sense to employ detailers, they wouldn't say because they get these commitments from physicians which are of value to the company. The commitments or the quasi-commitments from physicians in and of themselves are of no value. There are 90,000 of these people, and you have not — the agency has not brought any action for these — below these many years. Ninety thousand of them. And all of a sudden, you say — you come in and say, oh, you have been in violation of the law in the past, and you're going to have to pay a lot of money for all these people that you didn't give overtime to in the past. I — I just think that's extraordinary. Well, to the extent that there was an industry expectation that was based on anything DOL had said, it was based on, as far as we know, based on the 1945 opinion letter, which said not — Well, you didn't — you didn't even know about that. Right. And yet you expect the — the industry to know all about it, and yet it escaped your attention? Again, our argument is not that they should have known from the — about the opinion letter. Our argument is that the proper application of the promotion sales regulation to the facts of this case is pretty clear, and that if GSK's top-level management was asked to defend the use of detailers, they would say these people are important because if they persuade physicians to write more prescriptions and those are filled with GSK products, then pharmacies will reorder the drug and our wholesalers will reorder it from us. You have been guilty of malfeasance for 70 years, right? These 90,000 people out there who have been in violation of the law, and the agency has done not a blessed thing. To — to return to the 1945 opinion letter, the opinion letter was based on the premise that the employees exercised discretion and independent judgment in the performance of their duties. That's what the — what DOL said. Counsel, I thought that this whole system was set up on giving industries the opportunity to ask the government for an opinion letter, correct? Right. I saw in the briefing hundreds of opinion letters by hundreds of different industries. Outside of this 1945 letter, did anybody else, any other pharmaceutical company, ever set out for the government or seek an opinion letter that you're aware of? I'm aware of only one instance. I think this is not a matter of public record, but there was one request in, I believe, December of 2007 for an opinion to the effect that the detailers were covered by the outside salesman exemption. DOL never responded one way or the other. You don't suggest — you're not arguing for a rule that if — if an individual does not seek an opinion letter, he's guilty? Is that — No, I'm not arguing for that rule. Is it, Mr. Malcolm — Mr. Stewart, is it — is it true that that option is no longer available, that the Department of Labor no longer gives opinion letters? It does — it has phased out the opinion letter program and gives other forms of administrative guidance. That is, DOL's rationale was that the opinion letter program had not been cost-effective because often the — the bottom line — often the bottom line answer to the question would turn on factual nuances of a particular employer and wouldn't provide much guidance to others. And so it's tried to provide forms of guidance that are — speak to the industry or a class of employees as a whole. Thank you, Mr. Stewart. Mr. Clement. Mr. Chief Justice, and may it please the Court, Petitioners are two pharmaceutical sales representatives. They were hired for a sales job. They were given sales training. They attend sales conferences. They are assigned to sales territory. And they are evaluated and compensated as salespeople. And they don't make sales. With respect to — Your long list sort of stopped one step short. They don't make sales. With respect, Mr. Chief Justice, we disagree. We think they do make sales in the way that is relevant in this industry. And we do think they make sales in some sense, which is the practical construction the agency has always put on the sales requirement. Could you give me what your regulation is going to be? And would it exempt everybody from coverage? Meaning, you seem to be saying if in some sense they make sales, it seems that every promotional person will be a salesman. That all industries have to do is put one or two forms of sales activities involved in the work of their worker, and they're exempt. Give me your definition. As long as it's in some sense that covers everybody's exempt. Yes, but, Justice Sotomayor, if I could, there's two important qualifications that avoid the slippery slope concerns you're talking about. One is, it's I think common ground among everybody that to qualify for any exemption or certainly all of these relevant exemptions here, it has to be your primary duty. So you can't just slip in a little sales activity for something and get that person qualified. The other thing, and I think this is very important. Well, it seems like the sale here is not the primary duty. The sale here is to schmooze the doctor and give him information. That's what you said in one of your briefs. Your company said in one of its briefs in a products liability litigation. With respect, Your Honor, the commitment is very important in this industry. It is the objective of the sales calls to get a commitment to prescribe when medically necessary. Now, it is true that there is prologue to that and there is efforts to promote before you get that particular sale. But the regulations address that particularly and they say, as long as you are Sotomayor, primary duty is one of the limiting and what was the second limiting principle? The second limiting principle is actually what I'm talking about now, which is if you look at 503, which are the regulations that draw the distinction between promotion and between being outside sales, they do not say that promotion is non-exempt activity. What they say is it depends who does the promotion. And as long as the outside salesperson does the promotion in conjunction with his or her own sales or solicitations, then that is exempt activity. And what they are trying to say is that Ginsburg It also says promotional work incidental to sales made by someone else is not exempt. And these sales, I mean, eventually there is a sale to a hospital, to a pharmacy, and that sale is not made by the detailer. Clement But, Justice Ginsburg, I think it's important to recognize that the reason that 503 draws a distinction between promotional activity in conjunction with the salesperson's own sales or promotional activity with respect to somebody else's sales is they are concerned about the consideration where somebody else is going to follow up with the same customer to close the deal. And if you look at the regulatory commentary, that's what they are concerned. They don't want to sort of have double counting where somebody promotes with a sales target and then somebody else follows up to close the sale. And nobody here  Kagan There is one thing that they are concerned about, but it may not be the only thing. I mean, if you look at these regulations, it seems as though what they are trying to do is draw a distinction between people who actually consummate transactions, transactional people, and people who are pitchmen. And what the Department of Labor here is saying is detailers are people who make pitches. They are not people who consummate transactions. Well, Justice Kagan, I really think if you look at the regulations as a whole and the commentary and the Stein report and the Weiss report, they are not worried about sorting out the pitchmen because they understand that the classic outside salesperson is a pitchman who then tries to get a commitment to buy or some other commitment from the sales target. So what they are trying to do is really distinguish not between pitchmen and salespeople, but between what they refer to as missionary men or people who pave the way for somebody else to make the sale. And I really think that's the focus of the 503 regulation. And so the government's argument really boils down to the notion that there's nobody in this industry that makes enough of a commitment with the doctor for anybody to be involved in anything but promotion with the doctor. And that's why isn't that possible? I mean, your brief seemed to suggest that in every industry there needs to be some group of people who would be classified as outside salesmen, and that's not necessarily the case. There may be some industries, and here it's as a result of regulation, or it may be because of other business practices, where there just isn't anybody who's an outside salesman. Justice Kagan, it's theoretically possible, but it would be odd, especially in an industry that employs 90,000 people, in order to get a commitment to prescribe from the doctor. And I think if you look across the country... What is this commitment? Is the commitment in writing? The commitment's generally not in writing, Justice Kennedy. Would it be lawful to make it put it in writing? I don't know that anything would turn on whether it was in writing or not, because what's... Would it be lawful to put it in writing? I think the answer is yes. It's important for the commitment not to be binding because of the nature of the doctor's role. Nobody wants to go into a doctor's office, let alone the salespeople, and say, look, whoever it's the next person who walks in the door, prescribe them the product. But then it sounds to me that it's not a commitment, unless the doctor says, well, I'll look at this. This is interesting. I'll go home and read your material. That's not the kind of commitment they're looking for, Justice Kennedy. They're looking for a commitment that sometimes it's the next patient that presents the condition for which the medicine is medically appropriate that they will prescribe. And if you think just practically... But it's got to be nonbinding. It has to be nonbinding. I agree. But I don't think that the government... And that's why it's not in writing. Well, but you can have a nonbinding commitment in writing. You can have a binding commitment that's oral, as long as it's you know, I don't want to get into the statute of frauds here. But it seems to me that the binding nature is not dispositive either. You can have a situation, look, if I agree that I'm going to buy something, I can often return it. Sometimes there's a cooling-off period, things like that. Well, let me ask you this, and I'm not well versed in all of the specifics, but my understanding is that the Federal Government has expressed new concerns, has new regulations, new rules about these outside sales. Does that mean that the nature of the work has changed in the last 5 or 10 years, so that the 70 years we're talking about is not relevant? Would you comment on that? I'd love to, Justice Kennedy. I think to the contrary. I think that, I mean, the government actually ironically says that the 2004 rulemaking, which is the last time there was any rulemaking, didn't change anything substantively. We think that's wrong. We actually think there was an important substantive change to the 503C regulations and others, which addressed the following problem, which is not that the basic role of the outside salesperson has changed, but the technology has changed in such a way that it would be silly to draw a distinction between whether the salesperson actually takes the order and writes it down or gets a form in triplicate, or rather gets a commitment to buy from the sales target, who then actually enters the order on a computer on their own. And that, I think, is the specific situation that the agency was confronted with. And in 2004, they said, we don't want things to turn on who enters the order, whether it's the customer on their own computer or the outside salesperson. But, Mr. Clement, I thought that in 2004 there were two proposals, really, and one was the proposal that was changed, and the other was the proposal to get rid of this promotional stuff and to allow people who promoted products to qualify as outside salesmen, and the agency specifically rejected that suggestion. Absolutely, Justice Kagan, but there's always been an effort to try to get all promotional people treated as being exempt. But that's different from what's being asked for here, which is the last person who makes a visit to the person who places the relevant order in the industry and gets a commitment from that person. That, in contrast to general promotion, often directed at the world at large, has always been the hallmark of a sale in the Department's own flexible approach.  The request seems to be inconsistent with this opinion letter. The request is put in by the pharmaceutical company, and they want an exemption under administrative employee. In the Department of Labor's response, allowing that exemption, it says that these detailers, and they use the word detailers, medical detailers, are engaged in a form of promotional or missionary work. Well, Justice Ginsburg, I want to say two things about that. One is to say, obviously, that may depend a little bit on how the particular role was described. If you're reading from the 1945 opinion letter, I mean, that may be somewhat different. But I do think that what's important here is that promotional activity itself is not problematic. Promotional activity is exempt as long as it's in conjunction with the person's own sales or solicitations, is the word of the regulation. So I don't think that's possible. The letter goes on to say that these detailers are engaged in a form of promotion, not having for its object the making of specific transactions. Well, and again, Justice Ginsburg, we would take issue with that and say, no, there is an interest in getting a specific commitment. It is a commitment to prescribe. It may be somewhat – it is nonbinding, and it may be somewhat forward-looking. But I don't think that distinguishes this industry from many industries. It's not everything. Ginsburg. But as far as your 70 years, it's suspect for two reasons. One is we're told that in the early years, at least, before there were regulations restricting the sale of prescription drugs, that these detailers did two things. They did have their informational function, but they also did direct sales to pharmaceutical companies, to hospitals. So for at least 20 years of those 70 years, these people were engaged in what the Department would call sales. So that's suspect. And then when we have the commitment, the opinion letter that says we have a category for these people, they are engaged in instruction, in information, they are not engaged in sales, but because they're so independent, we rank them as administrative. In the particular case, we rank them as administrative people. So it's not as though there was a sudden about-face, as you suggest. We have a categorization as administrative employees, but not sales employees. And we have a history of these detailers at one time actually selling. Well, Justice Ginsburg, let me say, I mean, certainly as the regulatory environment has changed, the nature of how the sales are transacted in this industry have changed. But I think the focus is very much on the doctors, appropriately, because they're the ones that place the order. But I also want to be responsive to the administrative exemption. You wouldn't mind being exempt as administrative, would you? I wouldn't, Justice Scalia, but I do want to be. But they've changed their view. They've changed their view on that, too. And I certainly don't want this Court to think that the industry somehow has the administrative exemption as an ace up their sleeve or in their back pocket. And it's really the same exact issue, because once again, the agency has changed their view, and once again, their view is not based on anything that has to do with labor. Did you claim exemption as administrative employee? We did, Your Honor, in the district court. It's not before this Court, because we got summary judgment in our favor on the outside sales exemption. But I really would think it would be a mistake for this Court to say that. So that would be still open if you lose on the outside sales? It would, Justice Ginsburg, but you're just deferring the same inquiry, because the government's position, once again, is after 70 years of having the industry proceed on the assumption that these individuals were exempt, they now have changed their mind. And again, their view has everything to do with FDA regulation, and nothing to do — Well, Mr. Clement, I'm sorry. And nothing to do with labor policy, because what they say is that now, because of the government's own off-label prosecutions, these outside salespeople have to stick to a script in order to avoid — in order to avoid off-label liability. And because they have to stick to the script, they are told they don't exercise sufficient discretion to come within the administrative exemption. And the problem here is the Labor Department, instead of looking at this and making a rational judgment about labor policy and whether these individuals who make $93,000 on — for the median should rationally be the kind of workers that are protected by the Fair Labor Standards Act, instead, they're looking at things that have everything to do with FDA regulation and nothing to do with labor policy. You've suggested — I'm sorry. Are they paid commissions? If they're — if the salesman or the promotion agent, as the case may be, is successful in his territory in getting doctors to prescribe the drug, does he receive extra pay? He receives incentive compensation. What does that mean? Does he — I mean, an outside salesman in one document, it says he's a person who often obtains a commission on his sales. Right. And now what I'm trying to figure out — I might not have the right words to ask the question — are these people, people who in some sense or other receive commissions on their sales? And the answer is — for the Petitioners on this record, the answer is yes. They're not the commissions that are one-to-one correspondents. But what they do is they receive substantial incentive compensation, about 25 percent of the total, and it's based on the sales of the product in their sales territory. So if the — How is that different from a bonus that an employee gets? How is it any different than what most companies do in giving a bonus at the end of the year? Certainly based on the facts in this record, at the time of this case, it's much more tied to the performance of the product in the sales territory. And I don't think that's — you know, it's not based on the company's overall performance. Mr. Clement, you give me one definition of outside salesman, the one that you prefer for us to apply here. The Department of Labor gives another, and the one they're giving, according to them, is a bright-line rule. It's easy to apply. You have to do some sort of transfer of title. That's as their rule. Tell me what the — your argument is that — why your rule has to win, meaning, aren't we supposed to give deference to the expertise of the agency, especially when Congress lets them define the scope of the — Justice Sotomayor, two responses to that. One is, you can't defer to the Labor Department's preferred construction because it's flatly inconsistent with the statute. This idea that you have to have a transfer of title cannot be squared with 3K. It cannot be squared, at least as I understand it, with some of the own — the own advice they've given, which is all you need is a commitment to buy. That's what they've told people since 1949. There's an example in that Weiss report from 1949 involving a jobber where you have a situation where somebody is treated as an outside salesperson, even though they never have title over the product. So they get the commitment to buy from the sales target, and then a jobber who works for a different employer is the one that transfers title. That's at page 11 of the NFIB brief, if you want to look at it. Kagan. I guess I'm not sure I understand what you just said. If — if — forget the transfer of title business, but if it's just — we're requiring a transaction here, and we're drawing the line between people who do transactions and people who just advertise or make pitches or whatever you want to do it. That's perfectly consistent with the statute, isn't it? I mean, you can argue about is it the only possible reading. You can even argue about whether it's the best possible reading, but it's surely a possible reading. It is a possible reading, Justice Kagan, but it's not the one that the Labor Department has advanced in their amicus brief. So you can't defer to that. I mean, you can decide that it's the best reading of the statute if you want. Well, I suppose that that's a question for them. I read their amicus briefs to sort of suggest two things. Sometimes they just talk about transactions, and sometimes they talk about transfer of title. Well, and with respect, Justice Kagan, that's one of the many problems with deferring to amicus briefs, because when an agency gives guidance in an interpretive rule or something, there's one place and they provide the answer. Now, I don't know if the government wants you to defer to the argument on page 12 or the argument on page 20 or the argument on page 24. Well, I think that they would say that it doesn't make any difference because they've never really seen a person who makes transactions without transferring title. So I think that they would think that the difference is no. With respect, they have seen that person. Assignment, for one, which is mentioned in the submission. Well, assignment's in the statute, but this Jobber example is right out of the Weiss Report in 1949, and the outside salesperson in that case never had title. The title comes from the Jobber who works for somebody else. So the salesperson in that instance never had titles, not even in the chain of distribution. Yet they say that is a clear case where the person is an outside salesperson and exempt. Now, if you're going to defer to the argument on page 12 or the argument on page 24, I think that's one of the many problems with deferring to amicus briefs.    Justice Breyer, there are other documents in this HEC motion that I know you're aware of, that there was a request in 2007, and that the Justice of Carla Baber… That was opinion letter they said. I thought they said that was an opinion letter. It was a request for an opinion letter. I'm sorry. Yes. I asked if there was a request from the pharmaceutical companies for a rulemaking on the class of proper classification. No, there wasn't, Justice Ginsburg, but I think that actually cuts in our favor. Because in 2004, a lot of companies were coming in with things where they thought it was unclear, where they thought there was some doubt, and asking for clarification. This was so well understood that the outside sales exemption, or perhaps the administrative exemption, covered the outside sales force of this industry. What's the case that I cite if this opinion is written the way you propose, and this Court says, well, this has been 70 years, or maybe 10 years, if you take the new regulations as studying a new regime, and the Department has never made an objection, and therefore it follows that the Department's interpretation is implausible or improper? And then I cite some case from our Court. What — how do I write this? I would — I would — I would ask you not to be bound by having to cite a case. I would ask you to just use the following reasoning, though, which I think is 100 percent — and there's plenty of cases you could cite as perhaps CF cites. I'd like one. Sure. Well, here's — let's start — let's start with Fox, and just the basic notion that in administrative law, if you're going to change your position, you have to acknowledge that you're making a change. I think at a minimum here, if they're going to impose this kind of massive retroactive liability on this industry, they should— But, Mr. Clement, this isn't a change. You've referred to it as a change in a lot of — in a lot of times. But what we have here is an agency that for some number of years thought that this was not the most urgent problem on their plate. Indeed, one would think this was a pretty peculiar Department of Labor if they thought that this was the most urgent problem on their plate. So they didn't enforce it. But now the question has come up. And so they say, well, look to our regulations. This falls on one side of the regulation. Now, you've been given a gift for all these years, is one way of looking at it, because you were not their most urgent problem, and so they didn't enforce their own regulations against you. Justice Kagan, here's the thing. We can quibble about whether or not there is a change in their position or whether they just didn't have a position before. But I think the important thing is they've imposed, by taking this position in an amicus brief and asking for deference to it, massive liability on this industry. The PhRMA brief estimates it's billions of dollars. Now, I— Why must you look to an amicus brief? Why not just look to the regulation that defines—the regulations that define sale and that define promotion? The 541-503 says, promotion work incidental to a sale made by somebody else is not exempt. Why do we get into the amicus brief when we have in these 541 regulations a definition of sales on the one hand, promotion on the other, and then this statement that promotion work incidental to sale made by somebody else is not exempt? Why doesn't — why isn't that the answer to this case? Here's the answer as to why that's not the answer, and then let me circle back and say why, if you're going to err on one side or the other, you shouldn't err on the side of imposing massive retroactive liability. The reason that that's not a simple matter of deferring to that is because that same regulation earlier says that promotional work is exempt if it's in conjunction with the individual's own sales or solicitations. Now, I happen to think it's pretty clear that these, by getting this commitment, which is the functional equivalent of a commitment to buy, which is what the regulations and the regulatory interpretations have always said is a sale in some sense, I think these are sales. Certainly, I don't see— But does the pharmaceutical company have a sales force? I mean, who sells to the wholesalers, the pharmacies and the hospitals? It's not this kind of outside sales force. It's a much less sales-oriented transaction. The pharma amicus brief, for example, gives the example of a company that has 2,000 outside sales reps and 10 people that handle the movement of transfer of product to the wholesalers and the distributors. If you look at the district court's opinion at page 42A of the Petition Appendix, the district court addresses this issue and I think gets it exactly right, which is the reason there isn't a sales effort focused on the wholesalers and distributors is because their job is to have on stop the kind of medicines that physicians are prescribing. But there are people who sell to them. There may be only a few, but somehow— There's a handful of people, Justice Ginsburg, but that's — I mean, there's nothing anomalous about that. Most industries have some sales force that operates on the wholesale— Is that — are they exempt, too? What's that? The actual sellers from the — the people on the staff of the pharmaceutical company who sell to the wholesalers, pharmacies and hospitals, are they exempt? I don't believe so, Your Honor, at least not under the outside sales exemption, in part because they're not outside, in part because they're not really engaged in a sales effort. It does them no good. They can convince some wholesaler or distributor that the GSK product is far superior to a competitor's product, and it doesn't make any difference at all because, as a result of that, I mean, they need to have product that actual doctors are writing prescriptions for. That's what drives sales in this industry. There's nothing anomalous about that. If you think about any industry, sales activity is always directed at the people who place orders. In this industry, because of the learned intermediary doctrine, the person who places the order is the doctor, not the ultimate end user. Is there — let's say the doctor hears this spiel and the doctor says, okay, here's the first thing I'll think of, you know, when I have a patient with this and this. I mean, is that a sale? We think it is, Your Honor, but if you have any doubt about that, certainly at the point that the doctor then, when he sees the next patient, writes the prescription, at that point I think there's a sale because, again, what the regulations and regulatory history looks for is a commitment to buy. That's the relevant commitment to buy. That's the order of the industry. So what if the doctor — I suspect a lot of doctors do. They listen to this guy and they say, okay, I'll think of — you know, when it comes up, I'll think of your product. And the next guy comes in from the other company and he says, okay, when it comes up, I'll think of your product. Are those two sales or no sale? I think they're probably two sales, Your Honor. But, you know, it's the same thing — imagine somebody who's, you know, just sitting in their house and they get an encyclopedia salesperson, and they say, you know, maybe I'll buy that. That looks good. I'll buy it. And they say — but, you know, maybe the State law has a law that says you've got to wait 24 hours before you put the order in and the computer — Well, that's a much firmer commitment when they say, I'll buy it. The physician is just saying, I'll think of your product when the need comes up. But — well, I mean, what I was suggesting is maybe you're talking about a State that has a 24-hour waiting rule or something like that. So it's a commitment that, sure, I'm going to enter the order in 24 hours. Well, maybe another encyclopedia salesman comes in in 12 hours and he gives another commitment. One of the two people, he's going to put the order in, and one of the two people will certainly have finally had a sale. I think, again — But don't you think that the way this works — I mean, the way we should all hope it — the detailer comes in, the detailer provides information, the doctor says, that's very interesting, I want to think about it, I'm going to think about it. Then the doctor reads some medical journals. Then maybe the doctor goes to a convention and talks to other doctors about the product. I mean, that's what you would hope that a doctor would do before a doctor decided, I'm going to start prescribing this medicine. And the detail work is a part of that. But so are many other things before the doctor actually decides to do something. Sure, Justice Kagan, but you don't want to look at this like it's an isolated, one-time, you know, sort of interaction. I mean, one of the things that happens in this industry, like other sales industry, is there are multiple trips. The detailer goes there, maybe the first time he lays the groundwork. Then maybe the doctor reads some other information. Then maybe on the final visit, after all that information is there, finally the detailer gets the commitment to prescribe to appropriate patients. I think one way to think about the absurdity of making the difference turn on the is to compare this salesperson to another salesperson of medical devices who goes in, but these are medical supplies that the doctor uses in the doctor's office. Now, they're both hired for their sales experience. They both get sales training. They both have a sales territory. They're sitting in the same doctor's waiting room, waiting for the same doctor. They have samples in their bags. And they both get a commitment from the doctor. Now, what sense does it make as a matter of the FLSA and its labor policies to say one of those people is exempt and the other one is not exempt, because, for perfectly sensible reasons, we say that one of those products is a prescription where the doctor writes the order, and then with that order, the end user, the ultimate end user, can make the purchase at the pharmacy, whereas the other one can't do it? Scalia. Mr. Clement, I wanted to ask you about section 501 of the regulations, which is on page 4 of the appendix in the blue brief and was mentioned in the government's presentation. It says it requires that the employee be engaged in, one, making sales within the meaning of 3K, or, two, obtaining orders or contracts for services or for the use of facilities. What authorization is there for the agency to invent number 2? Justice Scalia, you heard the government's explanation, and as you suggest, if the government's right, then this shouldn't be a matter of just trying to limit things to 3K definition. I think even though at the 3K definition, though, if you look at that definition, it has every hallmark of being broad and functional and flexible. I would want to make one very important point, though, about the ultimate question here, because ultimately the decision whether to go one way or another on this issue has remarkable significance for retroactive imposition of liability. We all know that retroactive rulemaking is disfavored. Well, think about the consequences here. You have massive liability, between 4 and 6 years of effective time and a half, because of the way that the statute works. It has time and a half plus liquidated damages. You are talking about people who are very well paid, close to 6 figures. So unlike the classic worker who you might think is covered by the FLSA, who is a relatively low hourly worker, the amounts of damages here are quite significant. Of course, the effort to try to reconstruct these people's hours, given that they were told they were exempt and they were outside the office, trying to reconstruct how many overtime hours they actually worked is going to be a crapshoot at best. So if you think about all of that, and then you think about, as Justice Breyer indicated, the other option. Breyer, let's pursue this for a second. Sure. Because I would like to go back to Justice Kennedy's question, and this is only me speaking. I don't know how anybody else feels. If this had come up in 1941, you wouldn't have had a chance. I would have said, look at the statute. It says the Secretary defines it. You say, well, can he define it in a brief? Yes. You have to be careful of briefs, but yes. And that's the end of the case. It's not a question for judges. It's a question for administrators. But now it's difficult for me because of the passage of 75 years. And we can blame it in part on the industry or in part on the Secretary. There is blame to go around. So the question is, what do I do as a judge? And partly my instinct is get somebody to decide this other than a lawyer in the Department of Labor, because this is a hard question. And that's where we come to Justice Kennedy's question, which is he says, all right,  And what case do we cite? And I don't agree with you overturn our. I think amicus briefs are often helpful, but use them with care. And then I have the statute here, which talks about the Secretary doing the definition of outside salesmen. And I have lots of rules and regulations and reports which are fairly ambiguous in my opinion. So you tell me what to say. May I answer? Certainly. I would start by citing, I know it's not ours in fashion to cite lower court opinions, but I'd start by citing Judge Posner's opinion in Yee. Because the Seventh Circuit, they're a very distinguished panel, Judge Posner, Judge Wood, and one other judge. The three of them considered this question. Judge Sykes, I'm sorry, it's in my mind, a very distinguished judge. The point being that he said along these lines that the 70 years of history makes a significant difference. And here's the thing. Just like you expect an agency to confront a change in position, you'd at least expect an agency to confront the retroactive consequences. And in that sense, address them and make sense of it. And I would just simply say this, which is if you had a rulemaking, you could bring in all of the affected parties, including the current sales representatives who are not the ones bringing these lawsuits, whose jobs are going to be changed, and you could make a comprehensive view, as opposed to just getting in one side of an ongoing litigation and then making a decision about an amicus brief. Thank you. Roberts, thank you also. Mr. Goldstein, three minutes. Thank you, Mr. Chief Justice. Three quick points. First, if you read the transcript, you will see that my friend says that the nature of this job has changed, and that is an essential part of understanding this case. And there is an entire amicus brief in addition to our submission on behalf of pharmaceutical representatives, which explains how very much the requirements of pharmaceutical detailers and the restrictions on them have changed dramatically over the last couple of decades in particular. And that's why the continued references to 70 years are wrong. The other important part about the FLSA in particular is that there is a statute on this issue, and it says that an employer can request guidance from the agency, and if it doesn't do that, it is not — has no defense. Its job is to ask for guidance. And there are 50 different exemptions from the FLSA that cover hundreds of different categories of employees. And if the rule you are going to announce, because, Mr. Clement, you shouldn't be bound by any precedent, if the rule you are going to now announce is that there has to be rulemaking with respect to all of those, it is going to be an administrative nightmare. Two quick further points. The Department of Labor's position is that there has to be an actual commitment, not a precatory commitment. And Mr. Clement says, well, that's contrary to the definition of sale in 3K. Please read the definition again, and if you find something in there, something that is not a commitment, it can be an exchange, it can be a commitment that is even a consignment, it can be a traditional sale. Every one of those things is a commitment. It is impossible to find in the definition of commitment a rule that says — excuse me, in the definition of sale, something— Scalia. Where do they say that that's their test? Where does the Department of Labor say that's their test, that there has to be a commitment? I thought what they said in their brief was there has to be a transfer of title. There are two different parts to it. One is that they, as explained by Mr. Stewart, their view of transfer of title. But the Weiss report says repeatedly that there has to be a commitment to buy. That is— Which is it? I mean, you say, yes, yes, it's both. You have to agree— Is it the transfer of title or a commitment? It is the agreement to transfer title. There are two parts to it. Ah, okay. But there has to be the agreement, a firm agreement. It's repeated in the 2004 preamble to the regulations as well. Now, the last critical point I want to make is that Mr. Clement says there are commissions on sales in the sales territory, and what he is not talking about is any commitment by a physician. When you look at the transcript and he talks about sales in the sales territory, he is talking about the sales by the pharmacy. That's where the sale occurs in this industry. It's to the wholesaler and to the pharmacy and to the customer. He is not talking about a sale in the sense of getting a commitment to have— But the district court here made a finding, this is 42A, joint of the appendix for the petition. Sales volume is directly and exclusively driven by the number of prescriptions written by physicians, and plaintiff's job was to encourage such prescriptions. That, Mr. Justice Kennedy, I don't believe that you can fairly describe that as a finding of fact. That is the judge's view of the summary judgment record. It's a finding of logic, for Pete's sake. These are prescriptions. You can only get a prescription from a doctor. Obviously, the number of prescriptions, drugs sold, depends upon the number of prescriptions given by doctors. Two things about that. First is that a detailer doesn't get a commitment to a prescription, and then in addition, it's clear that there are numerous influences on what a doctor does. There's all the ad hoc— It's a different point. It is an important point. It is a different point. It's not the point you were making. Justice Scalia, the point that I will make at the bottom is that you have to have a firm commitment. That's what the Department says, and there's nothing in the definition in 3K that contradicts that. Thank you, counsel. Counsel. The case is submitted.